730 A.2d 376 (1999)
322 N.J. Super. 22
STATE of New Jersey, Plaintiff-Respondent,
v.
Edmund J. DAMIANO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 1999.
Decided June 10, 1999.
*379 Anthony Scordo and Michael A. Querques, for defendant-appellant (Mr. Querques, of counsel; Mr. Scordo and James E. Fagan, Jr., on the brief, Atlanta, GA).
Lisa Sarnoff Gochman, Deputy Attorney General, for plaintiff-respondent (Peter Verniero, Attorney General, attorney; Ms. Gochman, of counsel and on the brief).
Before Judges PRESSLER, BROCHIN and STEINBERG. *377
*378 The opinion of the court was delivered by PRESSLER, P.J.A.D.
Following a trial by jury, defendant Edmund J. Damiano was convicted of forty-four theft and sales tax crimes of the second, third and fourth degree, all arising out of his operation of an automobile dealership in Sussex County between April 6, 1992, and October 29, 1992.[1] More specifically, *380 he was charged and convicted of thirteen counts of third-degree theft by failure to make required disposition of property received, N.J.S.A. 2C:20-9, and thirteen related counts of third-degree misapplication of entrusted property by a fiduciary, N.J.S.A. 2C:21-15. He was also charged and convicted of five counts of third-degree theft by deception, N.J.S.A. 2C:20-4, and five related fourth-degree counts of the deceptive business practice of making a false or misleading written statement, N.J.S.A. 2C:21-7h. In addition, pursuant to N.J.S.A. 2C:20-2b(4), he was charged with second-degree theft by aggregating, as a single course of conduct, the thefts charged under N.J.S.A. 2C:20-4 and 2C:20-9, and, pursuant to N.J.S.A. 2C:21-8.1b, with second-degree fraud by aggregating, as a single course of conduct, the fiduciary misapplications charged under N.J.S.A. 2C:21-15. The remaining six convictions all arose out of sales tax crimes, namely, a fourth-degree crime under N.J.S.A. 54:52-13 (failure to register as a sales tax collector); a third-degree crime under N.J.S.A. 54:52-8 (failure to file sales tax reports); a second-degree crime under N.J.S.A. 54:52-15 (failure to remit sales taxes collected in an amount exceeding $75,000); a second-degree crime under N.J.S.A. 2C:20-9 (failure to make required disposition of collected sales taxes in an amount exceeding $75,000); a second-degree crime under N.J.S.A. 2C:21-15 (misapplication by a fiduciary in failing to remit collected sales taxes in an amount exceeding $75,000); and a second-degree crime under N.J.S.A. 2C:21-9c (misconduct by a corporate official in failing to remit collected sales taxes).
None of the foregoing forty-four convictions was merged with any other conviction. The judge sentenced defendant to concurrent seven-year terms on all the second-degree convictions; concurrent four-year terms on all the third-degree convictions to be served consecutively to the second-degree terms; and concurrent nine-month terms on all the fourth-degree convictions to be served consecutively to the second and third-degree terms. The aggregate prison term was thus eleven years and nine months. No parole ineligibility period was imposed. In addition, VCCB penalties were imposed on each count, totalling $2,200.00 and restitution in the amount of $204,218.04 was ordered, of which $196,603.90 was ordered paid to the State of New Jersey. Defendant appeals. We reverse, having concluded that some of the charges must be dismissed as a matter of law and that all the remaining charges must be retried.
According to the State's proofs, in early 1992 Damiano had negotiated with Charles Gallub, the owner and principal of a corporation known as Vehicle Wholesalers and Reconditioners (VWR) for the purchase of a Chrysler dealership in Newton trading under the name Newton Chrysler Plymouth Dodge. It appears that at that time the dealership was in some financial difficulty because it was on a C.O.D. basis with Chrysler Corporation for its parts purchases and also its floor plan financing with Chrysler Financial (formerly Chrysler Credit Corporation) was on hold, meaning that specific approval had to be obtained before new cars for inventory were purchased. It was defendant's plan to obtain his own floor plan financing from Chrysler Financial, to which he applied for that purpose. He also proposed to make the purchase from Gallub by way of a corporation he had formed for that purpose, Autolease 2000. Apparently because of Gallub's anxiety to turn over the business and defendant's eagerness to acquire it, they entered into a management agreement effective April 6, 1992. In general terms, it provided that defendant would undertake the management of the dealership and all its financial benefits and obligations as of that date, the actual purchase to be completed when, among other conditions, defendant obtained floor plan financing. Defendant took over the operation of the dealership on that date.
*381 It is clear from the State's proofs that defendant was inexperienced in operating a car dealership although he had been involved for many years in other aspects of the automobile business, including leasing. It is also clear that he was undercapitalized and had immediate and worsening cash flow problems. Among his claims of legal error at trial was the court's rejection of his proffer that under his agreements with Gallub, Gallub retained the sales tax obligation. Defendant also argues that he was not permitted to adduce evidence that a major cause of his financial problems during the six months of his stewardship of the dealership was the fact, unanticipated by him, that although he had assumed financial responsibility for the dealership, he was deprived of receiving the significant financial benefits of the customary manufacturer's rebates and discounts on the sales he made. He did not receive these funds because Chrysler insisted on applying that money to Gallub's delinquent parts account which, as of April 1992, amounted to about $100,000. It also appears that defendant started off by hiring new personnel, including an inexperienced office manager. And, of course, although he acted under the agreement as the owner of the business, both by way of control and financially, it was still owned by VWR. Thus, the vehicles were titled in VWR, sales of vehicles were made in VWR's name and VWR's dealer stamp, issued by the Department of Motor Vehicles (DMV), was used in title transfers. Moreover, VWR remained the responsible debtor on the floor plan financing, and the VWR checking account remained open and its checkbook remained on the premises.
Defendant's financial problems, which he was apparently able to deal with on some basis in the first several months of his management, apparently became exacerbated in August, when Chrysler Financial rejected his floor plan financing application because of the insufficiency of his capital and the inadequacy of his business plan. A private investor on whom defendant was counting apparently also then backed out. The record does not indicate whether he then sought alternative floor plan financing but, at any rate, it is clear that the financial situation was then beginning to unravel completely. On October 29, 1992, defendant left the premises altogether and ceased doing business. We understand from the record that Gallub then removed the remaining vehicles. Ultimately the franchise was sold to another dealer. According to defendant, the event precipitating his departure was the service upon him of liens of the City of New York against VWR, Gallub's corporation, in excess of $100,000.
The transactions constituting the gravamen of the indictment took place between August and October. Most of these counts involved defendant's handling of trade-ins. According to the proofs, there were seven purchasers of new or used cars who each traded in a car with an outstanding lien representing a retail installment debt to a financial institution. In calculating the amount due from the customer on the purchase, the customer was given a trade-in allowance representing the value of the vehicle less the balance of the unpaid debt. It was obviously defendant's obligation to forthwith remit that unpaid balance to the lienholder and obtain from it a properly executed certificate of title together with evidence of satisfaction of the debt as provided for by N.J.S.A. 39:10-10. Defendant did not, however, pay off the liens on the trade-in vehicles of these seven customers. Accordingly, these customers continued to be liable on their debts and were all eventually dunned by their creditors. In several cases, the vehicle was repossessed and sold. Defendant's response to the complaints of these customers was simply that these were bookkeeping matters that took some time to complete. As we understand the record, either Chrysler Corporation or Chrysler Financial made good on these debts, ultimately recouping its payments in its final accounting with Gallub when he sold the franchise. The only losses, therefore, that these customers suffered in the *382 end was the potential effect on their credit rating of not having made timely payment to their respective lienholders. Each of these transactions resulted in two separate counts of the indictment, one charging a third-degree theft by failure to make proper disposition of property received under N.J.S.A. 2C:20-9 and the other charging a third-degree misapplication of entrusted property by a fiduciary under N.J.S.A. 2C:21-15. Defendant was convicted of all resulting fourteen charges, and the separate convictions under N.J.S.A. 2C:20-9 and 2C:21-15 involving the same transaction with the same customer were not merged.[2]
A second group of charges arose out of defendant's sale to five customers of used vehicles he had taken in as trade-ins without having paid off the liens thereon. Since the existing lien had not been paid off and continued to show in the records of the DMV, clear title could not be transferred to the purchaser by defendant acting either for his own corporation or for Gallub's. Each of the drivers had been given dealer temporary registrations and when they expired, extended temporary registrations. Accordingly those five purchasers were unable to register the vehicles they had purchased and their inquiries were met with the response from dealership personnel that the problem was bureaucratic or administrative or related to bookkeeping difficulties and that the matter would be shortly taken care of. Ultimately, when Chrysler paid off the liens, the cars could finally be registered. Each of these transactions also resulted in two charges: third-degree theft by deception under N.J.S.A. 2C:20-4 and fourth-degree deceptive business practices under N.J.S.A. 2C:21-7h. Defendant was convicted of all ten resulting charges, and, again, the two separate convictions involving the same transaction with the same customer were not merged.[3]
In addition to these twenty-four convictions, there were four additional convictions arising out of customer transactions. As we understand the record, the manufacturer offered the customer, through the dealer and for an additional cost, an extended new car warranty. Two of the customers who had opted to purchase an extended warranty and had paid the dealership for it later discovered that the dealership, in turn, had neither made the purchase for them from the manufacturer nor remitted the funds therefor collected from the customer. Each of these transactions resulted in two third-degree charges: theft by failure to make required disposition of property received under N.J.S.A. 2C:20-9 and third-degree misapplication of entrusted property by a fiduciary under N.J.S.A. 2C:21-15. Defendant was convicted of all four charges, bringing the total number of convictions to twenty-eight. Again, the two separate convictions involving the same transaction with the same customer were not merged.[4]
The next eight charges arose out of the floor plan financing. Floor plan financing was explained by the testimony of Victor Storoz, an operations manager for Chrysler Financial, a wholly owned subsidiary of Chrysler Corporation. As we understand *383 the record, floor plan financing is simply a lending arrangement between a lender and the dealer on the dealer's inventory pursuant to which the lender advances to the dealer the money the dealer requires to purchase new cars from the manufacturer, the lender taking back a security interest in the cars and the dealer obligated, upon sale of each car to the customer, to repay the lender the amount allocated by the security agreement to that particular vehicle. Floor plan financing is also available to permit the dealer to purchase used cars. The floor plan financing for this dealership was provided by Chrysler Financial. The charges against Damiano were that he had sold four vehicles without repaying Chrysler Financial the stipulated sum required to satisfy its security interest in each of the vehicles, that is, that he sold the vehicles out of trust. Each of these transactions resulted in a third-degree charge of theft by failure to make proper disposition of property received under N.J.S.A. 2C:20-9 and a companion third-degree charge of misapplication of funds by a fiduciary under N.J.S.A. 2C:21-15. Defendant was convicted of all eight charges and, again, there was no merger.[5] That brings the total so far to thirty-six convictions.
Two of the remaining charges of which defendant was convicted were the second-degree so-called aggregating charges pursuant to N.J.S.A. 2C:20-2b(4) and N.J.S.A. 2C:21-8.1 that we have already described, and the final six all arise from alleged crimes under the sales tax laws, including duplicative theft and fiduciary misapplication charges, also described.
In challenging the judgment of conviction, defendant raises the following issues:
I. THE STATE FAILED TO PROVE THEFT BY DECEPTION AND THE JURY WAS IMPROPERLY INSTRUCTED AS TO THOSE COUNTS OF THE INDICTMENT.
II. THE STATE FAILED TO PROVE IMPROPER DISPOSITION OF FUNDS RECEIVED AND THE JURY WAS IMPROPERLY INSTRUCTED AS TO THOSE CHARGES.
III. THE STATE FAILED TO PROVE MISAPPLICATION OF ENTRUSTED PROPERTY. (Non-Tax Related Charges)
IV. DEFENDANT'S CONVICTIONS FOR SALES TAX-RELATED OFFENSES MUST BE REVERSED.
V. THE STATE FAILED TO PROVE DEFENDANT ENGAGED IN DECEPTIVE BUSINESS PRACTICES.
VI. THE TRIAL COURT'S ERRONEOUS INSTRUCTION AS TO REASONABLE DOUBT WAS UNCONSTITUTIONAL AND WARRANTS REVERSAL.
VII. THE JURY NEVER DETERMINED THE AMOUNT OF THE VARIOUS THEFT OFFENSES CHARGED.
VIII. THE COURT ERRED IN MAKING CERTAIN EVIDENTIAL RULINGS.
IX. THE SENTENCE WAS EXCESSIVE AS VARIOUS OFFENSES SHOULD HAVE BEEN MERGED AND CONSECUTIVE SENTENCES SHOULD NOT HAVE BEEN IMPOSED.
X. DEFENDANT WAS DEPRIVED OF HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL.
We are persuaded from our review of this record that substantial error in the charge to the jury, coupled with erroneous *384 evidential rulings, requires the reversal of these convictions. We make this preliminary observation. Many businesses fail either because of undercapitalization or mismanagement or a combination of both. A business failure typically involves unpaid creditors, and thus the misfortune of the businessman is ordinarily and regrettably shared involuntarily by those with whom he has dealt. Insolvency resulting in the inability to pay creditors does not by itself necessarily imply that there was criminal conduct involved or that the unpaid creditors were the victims of criminal conduct. If that were so, every bankrupt would be liable to criminal prosecution. Obviously the harm caused to the creditors of an insolvent business is always the proper subject of civil litigation. The question is when and under what circumstances it may also fairly be the subject of criminal liability. We think it plain that in order for criminal liability to attach to the individual acts or the course of conduct engaged in by a businessman on the brink of insolvency, there must be criminal intent and criminal culpability as defined by the criminal statutes. Obviously, criminal liability cannot attach simply because civil liability attaches.
Our careful scrutiny of the jury charge here persuades us of its essential and overall failure properly to apprise the jury of these distinctions. In general terms, there was inappropriate intermingling between civil and criminal concepts. More significantly, while the instructions as to the crimes charged followed the model jury charges, the judge failed to mold those charges to include the facts of the case or to adapt them where necessary to those facts. As the Supreme Court explained in State v. Concepcion, 111 N.J.. 373, 379-380, 545 A.2d 119 (1988):
Accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial. The trial court has an absolute duty to instruct the jury on the law governing the facts of the case. State v. Butler, 27 N.J. 560, 595, 143 A.2d 530 (1958). The charge must provide a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." State v. Green, 86 N.J. 281, 287-88, 430 A.2d 914 (1981)....
....
Model jury charges are often helpful to trial courts performing this important function. However, it is not always enough simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime. An instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case. See generally Schwarzer, Communicating with Juries: Problems and Remedies, 69 Cal. L.Rev. 731, 741 (1981) (reviewing studies evaluating the efficacy of jury charges and recommending "against the use of abstract statements of legal principles and for the use of instructions phrased as concrete statements of the questions to be decided, incorporating the evidentiary context of persons, places, thing[s] and events disclosed at trial.")
In this regard, it is "well settled in our State that the trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as he clearly leaves to the jury ... the ultimate determination of the facts and the rendering of a just and true verdict on the facts as it finds them." State v. Laws, 50 N.J. 159, 177, 233 A.2d 633 (1967), reargued, 51 N.J. 494, 242 A.2d 333, cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968). Incorporating specific evidentiary facts into a jury charge is especially helpful in a protracted trial with conflicting testimony.
*385 State v. Parker, 33 N.J. 79, 94, 162 A.2d 568 (1960).
See also State v. Hogan, 297 N.J.Super. 7, 15-16, 687 A.2d 751 (App.Div.), certif. denied, 149 N.J. 142, 693 A.2d 111 (1997); State v. Hinds, 278 N.J.Super. 1, 14, 650 A.2d 350 (App.Div.1994), rev'd on other grounds, 143 N.J. 540, 674 A.2d 161 (1996). We are therefore persuaded that the jury had insufficient guidance in making the determinations required of it after this long and complex trial. We consider the essential deficiencies in the charge and what we regard as critical errors in evidential rulings in terms of each of the statutes defendant was convicted of violating.

A

THE CONVICTIONS UNDER N.J.S.A. 2C:20-9
We address first the jury charge respecting N.J.S.A. 2C:20-9 under which, other than the sales tax charges with which we deal separately hereafter, fourteen of the indictment counts were submitted to the jury. The pertinent portion of that statute reads as follows:
A person who purposely obtains or retains property upon agreement or subject to a known legal obligation to make specified payment or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the actor's failure to make the required payment or disposition.... The fact that any payment or other disposition was made with a subsequently dishonored negotiable instrument shall constitute prima facie evidence of the actor's failure to make the required payment or disposition, and the trier of fact may draw a permissive inference therefrom that the actor did not intend to make the required payment or other disposition.
The State's proofs involved three entirely different scenarios. The first involved the seven customers who traded in their used cars in order to purchase new cars. All these trade-ins were still encumbered by liens, that is, the installment loans obtained by these customers at the time they first acquired those vehicles had not been fully paid off. The gravamen of the State's case on these seven counts was simply that defendant had calculated the customer's net purchase price for the new car by deducting the agreed upon trade-in value for the old car from the gross purchase price but then added back the amount of the unpaid lien, which defendant undertook to transmit to the lienor. Put another way, defendant assumed the customer's debt on the old car, reduced the trade-in credit to which the customer was entitled by that amount, obtained that amount from the customer by the manner in which the net purchase price was calculated, and then did not pay the debt to the customer's lender. The second scenario involved the two customers who had paid defendant, as part of their respective purchase price, the cost of the extended warranty. The gravamen of the State's case was that having charged the customer for the extended warranty, defendant failed to remit that portion of the purchase price received by the customer to Chrysler in order to purchase the warranty for the customer. The third scenario involved the floor plan financing of three new cars sold to customers. The gravamen of the State's case was that by reason of the security agreement constituting part of that financing, defendant was obliged, upon sale of each of those cars, to remit to Chrysler Financial the amount of the lien out of the proceeds of sale.
We turn now to the charge, which, as we have noted, generally followed the model jury charge. It did not, however, undertake *386 to explain to the jury these three categories of alleged crimes or the differences between them. Nor did it undertake to explain the essential factual differences between these three categories and the charges based on defendant's alleged failure to remit collected sales tax to the State, the gravamen of one of the six sales tax counts. Nor did it undertake to explain to the jury how the recited elements of the statutory offense related to any of these disparate sets of facts. What reference was made to the facts of this case was, on the other hand, confusing and misleading.
Thus, at one point in the charge respecting N.J.S.A. 2C:20-9, the judge was attempting to explain, in the context of the legal obligation to make specified payment or disposition, the meaning of the statutory phrase requiring the defendant to meet that obligation out of "his own property to be reserved in equivalent amount" as well as by the property itself that was received or from its proceeds. He explained that that phrase meant to "allow the actor to substitute, for the initially received property, his own funds presently in his possession over which he has direct dominion and control and from which he can meet his obligation in a timely manner." That was a perfectly proper and correct explanation. It was, however, immediately followed by this statement:
The law is silentis a silent factor in every contract, so that the parties who enter into the contracts in this State are presumed to have had the law of New Jersey in mind when they entered into their contract. Accordingly, if their contract omits or is imprecise in respect to a subject governed by the law of New Jersey, such as requiring a person or entity who collects sales taxes on any item to be responsible to remit it to the State of New Jersey, or does not make reference to an automobile dealer's obligation, under the Uniform Commercial Code, to deliver a retail customer a vehicle for which he has good and marketable title, free of all prior claims, the law implies such obligation into the contract of the parties.
We are at a loss to explain this statement in its context, and we are quite sure that the jury had no idea of what to make of it either. Beyond that, it was clearly misleading. Putting aside for the moment the reference to sales tax remittance, the balance of the statement told the jury that the Uniform Commercial Code imposed upon the dealer the obligation to deliver a good and marketable title to the vehicle he has sold. That is a correct statement of the commercial law. But it had nothing to do with the charges brought against defendant under N.J.S.A. 2C:20-9. To begin with, of course, the failure of an automobile dealer to deliver good and marketable title to the purchaser of a new vehicle is not necessarily a criminal act, a proposition we discuss further in our consideration of N.J.S.A. 2C:20-4. More to the point, none of the counts charging crimes under N.J.S.A. 2C:20-9 involved such a failure. Each of the customers named as a victim of that crime received good and marketable title to the new vehicle purchased. That fact was never in dispute. The customers who did not were those who bought used cars burdened by unsatisfied liensbut those customers were the named victims of the N.J.S.A. 2C:20-4 crimes. The potential for complete confusion and ultimate misleading was exacerbated by the judge's failure to tell the jury which alleged victims were victims of which crimes and which scenarios could constitute which crimes. In this posture, the jury might well have understood from the judge's instruction that the situation of the trade-in purchasers could be considered in these counts as well. We appreciate that the judge, early in the charge, read the entire indictment to the jury and that the verdict sheet summarized the elements, including the name of the victim, involved in each count. But the verdict sheet had no statutory reference and the indictment, because of its length and repetition, would require sophisticated study *387 and analysis to sort out and relate to the evidence. In short, as we have said, there was no guidanceonly confusionin trying to help the jury understand the nature of defendant's conduct that warranted a guilty verdict of the N.J.S.A. 2C:20-9 charges.
This was not the end of the problem on the N.J.S.A. 2C:20-9 charges. Shortly after the judge's statement respecting the Uniform Commercial Code obligation of automobile dealers, he offered the jury this instruction:
Where a person who sells property, which he knows to be subject to a security interest held by a third party, he must timely satisfy that security interest. If part of the purchase price received for the property sold is in the form of other property received from the purchaser, such as an automobile on a trade-in to a dealer, the person or dealer in the example receiving the property must promptly sell it and pay the security interest obligation from his own property which he should have reserved in equivalent amount.
In this statement the judge apparently lumped together the floor plan financing charges and the charges relating to the persons who traded in their old cars with liens on them. While that portion of the statement relating to the former is conceptually correct, we cannot understand the second quoted sentence or what the judge either had in mind or actually conveyed to the jury when he advised it that a dealer accepting a trade-in must promptly sell it and then pay off the security interest obligation. That is not the law. The dealer is not obliged to sell the trade-in. He is free to junk it or let it remain on his lot forever. What he is obliged to do, irrespective of his disposition of the trade-in, is to pay off the lien.
There are other observations we must make. The heart of the N.J.S.A. 2C:20-9 crime is the actor purposely obtaining or retaining property subject to either an agreement or a known legal obligation to make a specified payment or disposition but then "deal[ing] with the property obtained as his own and fail[ing] to make the required payment or disposition." The State was therefore required to prove that when defendant took the used cars in trade, or when he took the customer's money for the extended warranties, or when he sold new cars under floor plan financing, he intended to divert the money or property entirely to his own purposes or that thereafter he purposely failed to make the required disposition during the period of his possession. There was certainly evidence from which the jury could have found that defendant obtained the property with every intention of meeting his legal obligations and that this continued to be his intention in retaining the property. The jury could have found that defendant was in no way conferring or intending to confer a personal benefit on himself, that he was attempting to deal with serious cash flow problems that had been generated by Gallub's actions, that all available cash went into the meeting of business obligations, and that defendant was paying off these obligations as soon as sufficient cash flowed inin short that there was an absence of criminal intent. The court should have focused the jury's attention on this key question of intent but failed to do so.
We also note that the judge advised the jury, consistent with the statute, that payment by the defendant with a bad check is prima facie evidence of failure to make required disposition and that "the trier of fact may draw a permissive inference therefrom that the actor did not intend to make the required payment or other disposition." The problem here again is the failure of the judge to relate this to the evidence. Defendant did issue some bad checks, but the books of the dealership were poorly maintained by a young and inexperienced office manager. It would seem to us that under the circumstances of the general and ongoing financial mess, the jury should have been told that such *388 prima facie evidence and the resulting permissive inference required it first to find that defendant was aware that his accounts had insufficient funds when the checks were tendered.
We think it plain from what we have said that none of the convictions under N.J.S.A. 2C:20-9 involving customers or Chrysler Financial can stand because of the failure of the jury charge to adequately guide the jury in its task. We thus reverse and remand for retrial defendant's conviction on Counts 5, 9, 11, 15, 19, 23, 25, 29, 31, 33, 35 and 37.

B

THE CONVICTIONS UNDER N.J.S.A. 2C:21-15
We next address the companion charge to all the N.J.S.A. 2C:20-9 charges, namely, the charges of misapplication of entrusted property by a fiduciary under N.J.S.A. 2C:21-15. Each 2C:20-9 charge was accompanied by a cognate 2C:21-15 charge, both based on precisely the same conduct, the same transaction, and the same victim. The gravamen of the crime is as follows:
A person commits a crime if he applies or disposes of property that has been entrusted to him as a fiduciary, or property belonging to or required to be withheld for the benefit of the government or of a financial institution in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted whether or not the actor has derived a pecuniary benefit. "Fiduciary" includes trustee, guardian, executor, administrator, receiver and any person carrying on fiduciary functions on behalf of a corporation or other organization which is a fiduciary.
Defendant was obviously not a fiduciary in the usual meaning of that termhe was not a trustee, guardian, executor, administrator, or similar functionary. The applicability of the statute is not, however, limited to fiduciaries in that sense. It also expressly includes a person to whom property has been entrusted belonging to or required to be withheld for the benefit of the government or of a financial institution. This provision has been construed as applying to a person required to withhold sales tax from a customer and to remit it to the State, and indeed, the statute was amended by L. 1987, c. 76, § 33 to make that clear. See Cannel, New Jersey Criminal Code Annotated, comment 1 on N.J.S.A. 2C:21-15 (1998). See also State v. Pescatore, 213 N.J.Super. 22, 516 A.2d 261 (App.Div. 1986), aff'd o.b., 105 N.J. 441, 522 A.2d 440 (1987). It seems clear, therefore, that a person entrusted with funds required to be paid to a financial institution is also covered by the statute. As a conceptual matter, we are satisfied that defendant was liable to prosecution under this statute in respect of his failure to remit the balance of the loan due to institutional lenders who held the liens on the trade-ins that defendant had taken in partial satisfaction of the purchase price of the new cars.
It is also clear, however, that defendant was not liable to prosecution under this statute for either the floor plan financing charges or the charges relating to his failure to obtain the two extended warranties from Chrysler that his customers had paid for. Simply, Chrysler, the manufacturer of vehicles, is not a financial institution as that term is commonly understood. Chrysler Financial, its wholly owned subsidiary, may be a financial institution but Chrysler is not. Consequently, defendant's alleged failure to remit the purchase price of the warranty to Chrysler, on which, incidentally, he would have been entitled to a commission, is not a crime under this statute.
We are also satisfied that even if Chrysler Financial is a financial institution within the intendment of the statute, defendant's failure to pay off his own indebtedness *389 on the three new vehicles he was charged with selling out of trust does not come within the statute. We do not believe that statute can be fairly read as encompassing a relationship strictly between debtor and creditor with no intervening rights of any third persons. There is in that relationship no element of entrustment as is evidently required by the statute, which we thus read as encompassing only property received by the actor from another in which a third person has a right or for whose benefit the actor received it.
Accordingly, we are satisfied that the convictions of the crimes charged in the N.J.S.A. 2C:21-15 counts of the indictment that are companion to the N.J.S.A. 2C:20-9 counts dealing with the two extended warranties and the four floor plan defalcations must be reversed and those counts dismissed. These are Counts 26, 30, 32, 34, 36 and 38.
We are also satisfied that the convictions on the remaining fiduciary misapplication counts must be reversed and those matters remanded for trial for the reasons we have already stated. Those convictions were entered under Counts 2, 6, 10, 12, 16, 20 and 24. The instruction to the jury generally followed the model jury charge but made no attempt to relate the principles of law to the facts of this case and no attempt to explain to the jury the nub of the State's case in support of those charges or to indicate to the jury which of the numerous sets of scenarios constituted transactions falling within that statute. Considering the length of trial and the number of indictment counts, individual transactions, and sets of similar transactions, we are satisfied that the jury needed, and the defendant was entitled to have, a better explanation. Indeed, we have little doubt that the outcome might well have been different if the jury had understood which transactions were included, had been told what a financial institution is in distinction to an automobile manufacturer, and had been advised as to the meaning of entrustment and its inapplicability to direct creditor-debtor relationships. Although we have dismissed those charges, we are satisfied that the lack of explanation tainted the jury's verdict on them all.
Our final comment on the N.J.S.A. 2C:20-9 and companion N.J.S.A. 2C:21-15 charges relates to merger. The issue was not raised below but we have no doubt that the plain error rule requires us to consider the issue. As we have pointed out, the two companion charges as to each separate transaction involved precisely the same facts, the same proofs, and the same victims. This clearly does not preclude indictments and prosecution under both statutes. In State v. Pescatore, supra, 213 N.J.Super. at 24-25, 516 A.2d 261, we noted that defendant, as here, had been indicted and prosecuted for identical conduct under N.J.S.A. 2C:20-9, N.J.S.A. 2C:21-15 and sales tax violations. We there concluded that the "prosecutor may, in the exercise of sound discretion, proceed under any applicable statute...." Id. at 30, 516 A.2d 261. We added, however, this provisoa conviction, however, may "not be entered under more than one statute for the same offense." Ibid. So here as to the sets of charges brought only under N.J.S.A. 2C:20-9 and N.J.S.A. 2C:21-15, whether or not also attended by a cognate sales tax charge. The prosecutor can proceed on both or all. See State v. Crawley, 149 N.J. 310, 316, 693 A.2d 859 (1997). Only one conviction may, however, result. We leave to the new trial, in the event defendant is again convicted of companion charges, the question of which charge the conviction should be entered upon and which charge or charges should merge.

C

THE CONVICTIONS UNDER N.J.S.A. 2C:20-4 AND 2C:21-7h
We consider next the companion charges brought under N.J.S.A. 2C:20-4 and 2C:21-7h. The relevant portion of *390 N.J.S.A. 2C:20-4 is section a,[6] which provides that a person purposely obtaining the property of another by deception is guilty of theft if he purposely:
Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise....
The gravamen of the State's case in respect of these charges related to the five transactions in which defendant had taken a used car as a trade-in that had a lien still encumbering its title and had then sold the vehicle to a customer still so encumbered contrary to his representation to the customer, at least implicitly, that he was able to deliver good and marketable title to the vehicle and certainly contrary to the customers' belief that they were receiving clear title.
The State's proofs showed that the titling of an automobile is somewhat complex. We understand from the proofs and from our independent review of the relevant provisions of the Motor Vehicle Certificate of Ownership Law, N.J.S.A. 39:10-1 to -37, and the relevant provisions of Article 2 of Chapter 3 of Title 39 (Registration and Licensing) that it works in general like this. When a new car is delivered by the manufacturer to the dealer, it is accompanied by a certificate of origin. Upon sale to a customer, the certificate of origin is assigned to the purchaser, the assignment noting as well any security interest of the purchaser's lender in the particular vehicle. N.J.S.A. 39:10-8. The properly executed certificate of origin is then presented by or on behalf of the customer to the DMV, which then issues a certificate of ownership, showing thereon the security interest of the purchaser's lender. N.J.S.A. 39:10-10. When the owner of a used car sells it, he is required to assign the certificate of ownership to the buyer, N.J.S.A. 39:10-9, and if the certificate of ownership shows a security interest and the seller intends to convey good title to the vehicle, the seller must make payment to the secured lender, who is then required, within fifteen days after payment, to return to the seller the endorsed certificate of ownership showing satisfaction of the lien. Upon presentation of the certificate of ownership to DMV, properly endorsed as to satisfaction of the debt, the DMV makes a record notation of satisfaction, N.J.S.A. 39:10-10, and then issues a new certificate of ownership to the buyer, either showing good title or showing a new security interest relative to the buyer's financing of his purchase. N.J.S.A. 39:10-11. These endorsed and recorded security interests exclude dealer inventory security interests, i.e., floor plan financing interests, which are, by virtue of N.J.S.A. 39:10-11E, subject to Chapter 9 of Title 12A, Article 9 of the Uniform Commercial Code, and hence do not encumber the retail customer's title. Obviously, a vehicle, either new or used, cannot be registered without a properly executed certificate of origin or certificate of ownership. N.J.S.A. 39:3-4. Finally a twenty-day registration by a dealer is authorized by N.J.S.A. 39:3-4b.
We consider the proofs against this statutory background. When the defendant's new-car customer traded in his used car with an outstanding security interest, it was defendant's obligation to pay off the loan since the customer had, in effect, already provided him with the funds to do so. The lienor was then obliged to properly endorse the certificate of ownership showing satisfaction of the loan and to return it to defendant, who would then obtain a new certificate of ownership in his name or that of his business entity, which *391 he would then assign to his purchaser of the used car. We gather that that is what in fact occurred in many instances. In these five instances, however, the defendant did not pay off the lien and did not obtain a "clean" certificate of ownership permitting him to transfer the vehicle. Instead, he sold the encumbered vehicles to customers without providing them with a certificate of ownership but, rather, temporary papers.
Based on the foregoing, we think the following is clear. It may very well be that in the ordinary course of business a dealer has taken in trade a used car subject to a security interest and has an immediate customer who wants to buy it. If he then sells it, providing a temporary registration, intending to then take the steps necessary to pay off the security interest and obtain a new and unencumbered certificate of title, and if he then in fact does so and succeeds in registering the car for the customer under a proper certificate of ownership, we think it plain that no crime at all has been committed and certainly no crime as defined by N.J.S.A. 2C:20-4. In that case, of course, when the dealer sold the trade-in, there was still an existing lien, but the accomplished intention to satisfy it within a reasonable time necessary for the completion of all the steps and all of the paper work belies any actual or intended deception. What, however, of the dealer who intends to do all that is necessary at the time he sells the still encumbered trade-in, but does not do so? Our perception is that the criminality of a sale not thereafter attended by fulfillment of the dealer's obligations depends entirely on the intention of the dealer when the sale is made.
That conclusion is based not only on what we understand to be the practicalities of the situation but also on the legislative history of N.J.S.A. 2C:20-4. The Criminal Law Revision Commission charged with the drafting of the Code explained in its Final Report that generally, "the Code does not require affirmative disclosure" since "[t]aking advantage of a known mistake, which is influencing the opposite party to a bargain, is not criminal under existing law in the absence of special circumstances imposing a duty to correct the mistake." Final Report of the New Jersey Criminal Law Revision Commission, Vol. II, p. 225 (1971). It further explained that it was reluctant generally to criminalize such conduct because "the borderline between desirable and disapproved behavior in this area is so ill-defined in our society that criminal sanctions are likely to impinge on some conduct well within the bounds of approved commercial activity." Final Report, supra, at 225. The Commission, however, recommended three exceptions to the general rule of not criminalizing the failure to make affirmative disclosures, proposed as subsections b, c and d. Subsections b and c are not here relevant.[7] Subsection d proposed to criminalize the failure "to disclose a known lien, adverse claim or other legal impediment to the enjoyment of property which [the actor] transfers or encumbers in consideration for the property obtained, whether such impediment is or is not valid, or is or is not a matter of official record." Ibid. In the end, however, subsection d was not enacted by the Legislature when it adopted the Code, Cannel, supra, comment 1 on N.J.S.A. 2C:20-4, explaining that the Legislature "rejected this provision as having a significant and unwanted effect on commercial and real estate transactions." This court, by Justice, then Judge, Coleman accepted the Cannel explanation in State v. Rodgers, 230 N.J.Super. 593, 602, 554 A.2d 866 (App.Div.), certif. denied, 117 N.J. 54, 563 A.2d 821 (1989).
We have addressed this history not because we conclude that the sale of property encumbered by a security interest to a buyer expecting clear title may never constitute conduct criminalized by N.J.S.A. *392 2C:20-4. Clearly it may, particularly if the seller's intent was to deceive the buyer as in State v. Rodgers. We do, however, think that this history makes clear that the failure to disclose the encumbrance is not necessarily by itself criminal. It is in this context that we consider what the court told the jury in instructing it on this statute. This is what he said:
Under the law of the State of New Jersey the seller of a vehicle warrants to the buyer that the title conveyed there shall have theirconveyed shall be good, the transfer of title rightful and that the vehicle shall be delivered free of any security interest or other lien or encumbrance except those of which the buyer had knowledge.
We need not much belabor the point. Having deleted subsection d from the Commission's draft, the Legislature expressed its decision that a mere breach of the implied warranty of good title, obviously actionable under the Uniform Commercial Code in a civil action, is not by itself sufficient to constitute criminal conduct. We are aware that in several limited and ancillary contexts, we have approved the use of civil law concepts in determining particular issues in criminal cases. See, e.g., State v. Burks, 188 N.J.Super. 55, 60, 455 A.2d 1148 (App. Div.), certif. denied, 93 N.J. 285, 460 A.2d 684 (1983); State v. Lamb, 125 N.J.Super. 209, 215-216, 310 A.2d 102 (App.Div.1973) (Uniform Commercial Code rule that title passes on delivery held applicable to determining the criminality of an embezzling clerk who signed delivery slips for his employer); State v. Romero, 95 N.J.Super. 482, 487, 231 A.2d 830 (App.Div.1967) (rules for establishing value in civil cases may be applied by a criminal jury in determining the amount of the theft). But by the same token we have declined to apply commercial rules to criminal cases in clearly incongruent contexts. See, e.g., State v. Bernhardt, 245 N.J.Super. 210, 213-219, 584 A.2d 854 (App.Div.), certif. denied, 126 N.J. 323, 598 A.2d 883 (1991); State v. Somerset Cent. Corp., 216 N.J.Super. 716, 718-721, 524 A.2d 893 (App.Div. 1987). The mere breach of an implied warrantythe substance of the court's instructiondoes not by itself constitute theft by deception. The Legislature has so determined, and, we are satisfied, the imperative of commercial transactions so mandate. For these reasons, we conclude that the five convictions of theft by deception under N.J.S.A. 2C:20-4, charged in Counts 3, 7, 13, 17 and 21, must be reversed and the matter retried.
Much of what we have already said applies to the five lesser-included companion convictions under N.J.S.A. 2C:21-7h (deceptive business practices). We regard the jury's consideration of these charges irremediably tainted by the errors in the N.J.S.A. 2C:20-4 instructions. Beyond that, we further point out that although the judge followed the model jury charge, again he did not attempt to adapt it to the facts of the case. The jury was never told which of the alleged criminal scenarios were being prosecuted under N.J.S.A. 2C:21-7h and thus to which of the scenarios their consideration of that statute should be limited. These charges, the subject of Counts 4, 8, 14, 18 and 22, must be retried as well and, if defendant is again convicted of charges both under N.J.S.A. 2C:20-4 and N.J.S.A. 2C:21-7h, merger must be considered.

D

THE AGGREGATING CHARGES UNDER N.J.S.A. 2C:20-2b(4) AND 2C:21-8.1b
Defendant was charged and convicted of two "aggregating" crimes, N.J.S.A. 2C:20-2b(4) and 2C:21-8.1b. Both are, in effect, grading statutes. N.J.S.A. 2C:20-2b(4), encompassing Chapter 20 of the Criminal Code, provides in pertinent part that:
Amounts involved in thefts committed pursuant to one scheme or course of conduct, whether from the same person *393 or several persons, may be aggregated in determining the grade of the offense.
N.J.S.A. 2C:21-8.1b is to similar effect with respect to crimes committed under Chapter 21 of the Criminal Code, providing in pertinent part that:
The benefit derived or resulting harm pursuant to one scheme or course of conduct, whether in relation to the same person or several persons, may be aggregated in determining the degree of the offense.
The issue of an amount involved in a theft constitutes an element of the crime to be determined by the trier of facts. State v. Burks, supra, 188 N.J.Super. at 60, 455 A.2d 1148. In State v. Childs, 242 N.J.Super. 121, 131-132, 576 A.2d 42 (App. Div.), certif. denied, 127 N.J. 321, 604 A.2d 596 (1990), this court explained the relation between charges of individual thefts and aggregate thefts in the jury's determination:
Before aggregating the amount involved in two or more thefts, the finder of fact must first determine whether the thefts are constituent parts of a single scheme or course of conduct. This threshold determination is an element of an aggregated theft crime. Where the evidence could support either conclusion, the indictment may charge the aggregated theft in one count and each lesser theft in separate counts. In such a case, a trial judge would have to charge the jury that if the defendant is guilty of any thefts, it must determine which, if any, were part of a single scheme or course of conduct and which were not.
....
Where an indictment contains one or more counts of aggregated thefts and also contains separate counts for each allegedly constituent theft, the trial judge should instruct the jury to return a verdict for every count, and to indicate with respect to each allegedly constituent theft whether it was part of the scheme or course of conduct charged in a particular aggregated-theft count. The usual form of verdict sheet will have to be modified to allow the jury to report this additional finding.
In this case, the court instructed the jury, with words appropriate to the charge, that if it found "the amounts involved were taken in thefts committed according to one scheme or course of conduct the amounts may be added together to form a single total amount, whether stolen from one person or several persons." It never instructed the jury, however, to determine the amount of each theft or whether that particular theft was part of the scheme, or whether the crimes within the same scenario constituted a single scheme or course of conduct or whether all the scenarios, taken together, did so. For these reasons, we are satisfied that the charge to the jury was deficient. Beyond that, since we have held that all the convictions of the constituent crimes, but for the sales tax crimes, must be reversed and retried, then obviously the two aggregating crimes must be as well.

E

THE SALES TAX CHARGES
As we have noted, defendant was convicted of six crimes arising out of the sales tax law: a fourth-degree crime under N.J.S.A. 54:52-13, a third-degree crime under N.J.S.A. 54:52-8, and four second-degree crimes under N.J.S.A. 54:52-15, 2C:20-9, 2C:21-9c, and 2C:21-15. N.J.S.A. 54:52-13 provides that:
A person is guilty of a crime of the fourth degree if he is not licensed or registered with the Division of Taxation, and engages in conduct which requires him to register with or obtain a license from the Division of Taxation, with intent to evade, avoid or otherwise not make timely payment of any tax, fee, penalty or interest, or any part thereof.
N.J.S.A. 54:52-8 provides that:
A person is guilty of a crime of the third degree if he fails to file any return *394 or report required to be filed pursuant to the provisions of any State tax law with the intent to defraud the State or to evade, avoid or otherwise not make timely payment of any tax, fee, penalty, interest or any part thereof which shall be due pursuant to the provisions of the State Tax Uniform Procedure Law, R.S. 54:48-1 et seq., as amended and supplemented, or any State tax law.
The gravamen of these two charges was simply that defendant, with the requisite intent, had neither registered nor filed timely returns.
The gravamen of the second-degree crimes was the same in all four charges, namely defendant's failure to remit to the State the sales tax he had collected from his customers during his six months of operation of the dealership. The conduct charged was precisely the same in all four convictions, and while we do not doubt the State's right to proceed under all four statutes,[8] it is clear, as we held in State v. Pescatore, supra, 213 N.J.Super. at 29-30, 516 A.2d 261, only one conviction may be entered.
We reject defendant's argument that he was entitled to a judgment of acquittal on the third and fourth-degree offenses for the reason that he was acting only as agent for Gallub and Gallub's corporation in the sale of the vehicles and not as a vendor as defined by N.J.S.A. 54:32B-2(i)(1)(A), namely a "person making sales of tangible personal property or services, the receipts from which are taxed" by the sales tax law. The proofs showed that although the new vehicles were titled in Gallub's corporation, nevertheless defendant purchased used cars in his or his corporation's name. We are, however, satisfied that defendant was prejudiced in his good faith defense to both these two charges and the second-degree sales tax charges by the court's evidential rulings.
In sum, it was defendant's position at trial that he understood his operating and asset purchase agreements with Gallub to impose the sales tax obligation on Gallub. Defendant was asked on his direct examination whether there was any provision of the asset purchase agreement that addressed the parties respective tax-payment obligations. Defendant replied that paragraph 2.1(g) did. An extensive colloquy between counsel and the court ensued. The prosecutor took the position that paragraph 2.1(g) actually only addressed Gallub's tax obligation prior to the effective date of defendant's management of the dealership. Defense counsel insisted that the issue in respect of his good faith defense, was how defendant, in the context of the circumstances and the agreements themselves, understood which party was responsible for the tax payments. The prosecutor at this point relied on the parol evidence rule to preclude defendant from testifying to an understanding of the agreement beyond or in variation to its text. The judge apparently agreed, noting that that paragraph appeared to concern itself only with taxes due prior to the effective date of the agreements. Defendant was also precluded from offering, in this connection, proof of the amount of money generated by defendant's sales that were being regularly applied by Chrysler to Gallub's debts as further evidence of the understandings and agreements between them.
We think it clear that the evidence defendant was precluded from adducing was relevant to the intent element of both the third and fourth-degree crimes and may well have had some bearing on the knowing and purposeful elements of the *395 four second-degree crimes. The prosecutor's insistence that the evidence was barred by the parol evidence rule, apparently acceded to by the trial judge, misconceived the essential function of that rule and further blurred the distinctions between civil and criminal proceedings. It is perfectly obvious that the parol evidence rule was entirely inapposite here. It might well have been appropriate in a civil action between defendant and Gallub in which the meaning of the asset purchase agreement was in issue. But this was a criminal proceeding. The relevant question was not how the agreement was to be interpreted as between defendant and Gallub in a civil action but, rather, only what defendant reasonably believed the agreement provided in respect of allocation of the tax obligations even if he were ultimately proved to have been wrong in that belief. We are satisfied that this restriction of defendant's right to prove his good faith defense prejudiced his right to a fair trial. We thus reverse and remand for trial defendant's convictions on Counts 39, 40, 41, 42, 43 and 46.
Defendant also argues on appeal that the court committed plain error in not generally instructing the jury regarding the good faith defense vis-a-vis the intent element of the sales tax crimes. He relies on Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Since we reverse and remand all the sales tax charges because of the erroneous evidential ruling and the inadequacy of the instructions respecting the Title 2C crimes, we need not consider this argument. We assume that an appropriate charge will be requested on retrial pursuant to R. 1:8-7(b).
We have also considered defendant's arguments on appeal that we have not addressed. But for the counts whose dismissal we have directed, we are satisfied that the proof was sufficient to sustain the convictions. The problem was not in the sufficiency of the State's proofs but rather in the inadequacy of the instructions to the jury as how to consider those proofs. We reject defendant's remaining arguments. R. 2:11-3(e)(2).
We make one final observation. We regard this as a difficult case, not because the proofs are particularly complicated but because the line between civil and criminal liability is, in the circumstances here, so difficult to draw. Defendant apparently did not conceive of and execute this dealership enterprise as a scam, a criminal enterprise in the customary sense, or a scheme to take the money and run. It appears rather that he anticipated an entirely legal and straightforward business operation. His inevitable financial disaster was the result of severe undercapitalization, his inability to obtain expected financing, inexperience, poor management, and perhaps misrepresentations by Gallub as well. The essential question is whether, in trying to avert or meet disaster, defendant also engaged in criminal conduct subject to criminal penalty. It is that question with which, we are satisfied, the jury was never required to cope.
We are further of the view that the prosecutor bears a significant measure of responsibility. In a complex white-collar criminal case of this nature involving so many different fact patterns and so many different statutes, it is incumbent upon the prosecutor to assist the judge by framing clear and specific requests to charge that will give the jury a workable, comprehensive and comprehensible context for its deliberations. R. 1:8-7 requires no less. The prosecutor failed to do that. He must attempt, however, to remedy that deficiency at the retrial.
The judgment of conviction is reversed. We remand to the trial court for the dismissal of Counts 26, 30, 32, 34, 36 and 38 of the indictment and for a retrial of all remaining counts.
NOTES
[1] The indictment against defendant included 46 counts but two were dismissed at trial by the court.
[2] More specifically, defendant was charged in Counts 1 and 2 with these crimes against Stephen Cholewa; in Counts 5 and 6 against Victor and Jane Morales; in Counts 9 and 10 against Letitia O'Brien; in Counts 11 and 12 against John Milone; in Counts 15 and 16 against Robin Rosequist; in Counts 19 and 20 against Darrin Conklin; and in Counts 23 and 24 against Joy Matthews. Counts 27 and 28 charging defendant with these crimes against Donna Norman were dismissed at trial for lack of proof.
[3] More specifically, defendant was charged in Counts 3 and 4 with these crimes against Theresa Sotolongo; in Counts 7 and 8 against Jasmine Rapp; in Counts 13 and 14 against Kevin Hockman; in Counts 17 and 18 against Susan Cuff; and in Counts 21 and 22 against Karen Bell.
[4] More specifically, defendant was charged with these crimes against Joy Matthews in Counts 25 and 26 and against Wayne Clark in 29 and 30.
[5] More specifically, Counts 33 and 34 alleged an out of trust sale to James Calantropio on which Chrysler Financial was entitled to receive $13,800 on account of its security interest; Counts 35 and 36 alleged such a sale to Martin McDonald on which Chrysler Financial was entitled to receive $17,100; and Counts 37 and 38 alleged such a sale to Margaret Dutton on which Chrysler Financial was entitled to receive $13,500.
[6] Section b makes it a crime to prevent another from acquiring information that would affect his judgment of a transaction and section c encompasses the failure to correct a false impression created or reinforced by the actor or which he knows is influencing someone to whom he stands in a fiduciary relationship. Obviously neither of these is relevant here.
[7] See n. 6, supra.
[8] We have already addressed three of the statutes under which defendant was convicted, namely, N.J.S.A. 2C:20-4, 2C:20-9, and 2C:21-15. The fourth, N.J.S.A. 2C:21-9c, makes it a crime for a person to purposely or knowingly use, control or operate a corporation "for the furtherance or promotion of any criminal object." As to the mental culpability element, N.J.S.A. 2C:20-4 and 2C:20-9 require purposeful conduct and N.J.S.A. 2C:21-15 requires knowing conduct.